IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA

MARTHA JANE JOHNSON #202230,
          Plaintiff,

VS

FRANK ALBRIGHT, Warden of Julia Tutwiler Prison,

CYNTHIA WHEELER, Administrative Captain of
          Julia Tutwiler Prison (STP),

RICHARD ALLEN, COMMISSIONER of Alabama
          Department of Corrections,

KIM TOBIAS THOMAS, Counsel of Record for
          Alabama Department of Corrections (DOC)
JUNE MASON, Correctional Officer (c.o.)
ET AL,
               Defendants.

2006 JUN 20  A 9: 51

CIVIL ACTION No. 2:06CV546-W

**MEMORANDUM BRIEF IN SUPPORT OF CLAIMS AND ISSUES OF CONSTITUTIONAL RIGHTS BEING VIOLATED AND CAUSE FOR INJUNCTIVE AND DECLARATIVE RELIEF OF SUBSTANTIAL HARDSHIP AND TO REMEDY ACTUAL DAMAGE BY IMPEDIMENTS**

Comes Now, Plaintiff MARTHA JANE JOHNSON, pro se, in the above-styled cause to humbly and respectfully seek intervention and relief by this Court as submitted:

1. The Defendants are employed by DOC as designated agents within the jurisdiction of this Court geographically and by Statute. Each have contributed to significant deprivation and actual damage of access to court and attorneys in violations of the First and Fourteenth Amendments, even to the magnitude of Sixth and Eighth Amendments to the United States Constitution. It is prayed that all Defendants be held accountable and liable in both official and individual capacities. Certain regulations and/or practices in a long term pattern unjustifiably obstruct access to court and attorneys—moreover an overwhelming hardship and finally actual damages resulted from these actions, as arbitrary abrogation has no system of monitoring unchecked power within the prison. This Plaintiff is confined and subject to unbalanced power over essential liberties and unjustified extremes of unreviewable discretion. This Court has jurisdiction also pursuant to 42 USC §1983, 28 USC §§ 1331 and 1343 and precedent within below factors.

2. According to Eldridge v. Block, 832 F. 2d 1132, fn 2 (9th cir. 1987):

"Section 1983 provides in relevant part:
 'Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia, subjects or causes to be subjected any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .'
42 USC §1983"

                                        (emphasis added here)

3. As to the defense of qualified immunity (for defendants), in <u>Johnson-El v.</u> <u>Schoemel</u>, 878 F. 2d 1043, 1048, 1049 (8th Cir. 1989) (relying on <u>Harlow v. Fitzgerald</u>, 457 U.S. at 814, 102 S.Ct. at 2736, and <u>Mitchell v. Forsyth</u>, 47 US at 535 n12, 105 S.ct. at 2820 n12)

"The defense of qualified immunity is a means of protecting government officials from vexatious lawsuits questioning the discretionary performance of their duties. It accomodates competing social interests by <u>ensuring that officials who knowingly violate the law are held accountable</u>, while officials who reasonably exercise their discretion are protected, <u>Warner v. Graham</u>, 845 F. 2d 179, 182 (8th Cir 1988) Actual knowledge of the law is not <u>required; if the law is clearly established, the qualified immunity will fail unless the official "claims" extraordinary circumstances and can prove that he (or she) neither knew nor should have known of</u> <u>The relevant legal standard</u>." <u>Harlow v. Fitzgerald</u>, 425 us at 818-819, 102 S.Ct. at 2735-39 " (Id, 1048, text relating to hn3)

"... Prison condition litigation has become quite common in the last 30 years. The questions presented are usually similar and frequently and frequently do not have academic or otherwise inaccessible analysis For this reason, <u>we are less inclined</u> to feel that the applicable law in this area is a mystery <u>even to laymen</u>. Whether that law is clearly established depends on what would be apparent in each situation, "where an official could be expected to know that <u>certain conduct would violate statutory or constitutional rights</u> he (or she) <u>should be made to hesitate</u>..." <u>Harlow v. Fitzgerald</u>, 457 us at 819, 102 S.ct at 2238" "(Id 1049)
(emphasis and female gender added here)

4. Culpability is (said to be) established in one of three ways: personal administrative involvements, personal knowledge, or through the breach of a legal duty that <u>proximately caused the injury</u> (Johnson-El at 1049 on <u>Individual</u> <u>Liability</u> (also with a host of about six different federal circuits and at least one by the United States Supreme Court on point cited therein). Even though the Warden of this prison as well as Commissioner of DOC "could be liable for the decisions of the officers present" (Id Johnson-El at 1049) "because a link could be established from their action to ... duty to train and supervise (Id <u>Johnson-El at 1050</u>) (see a similar comparison in <u>City of Canton v. Harris</u>, 469 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (on liability of a municipality). The Plaintiff in the case at hand projects such accountability and culpability exists in the cause at hand.

5. First, to eliminate the easiest factor. DOC has spent <u>easily</u> close to a million dollars having a weekly "monitor" in Basile, Louisiana — the <u>highest paid</u> authorities of JTP rotate; approximate sixty hours involved including traveling, dining, casino, sleep, of which 36 hours are time and half from departure at JTP to arrival back. Yet not <u>any</u> funds or checks system on arbitrary actions or accountability on

the same authorities within the confines of Alabama's own prisons. This is where Commissioner Richard Allen is held accountable. Had he implimented such a system within his own prisons the cause at hand would have been most likely stopped before substantial hardship and inevitable actual damage evolved into a last resort of court intervention — after actual damage caused a catastrophe in access to court for this plaintiff.

6. In neglect of such obvious need the Commissioner "subjects or caused to be subjected... to deprivation of rights, privileges or immunities secured by the constitution and laws shall be liable to the party injured in an action of law, suit in equity, or other proper proceeding for redress" (Id Eldridge, supra, quoting 42 USC §1983) to be held accountable as continuing the grand expense on monitoring the few of three hundred women for three years until 2006, adding men — yet not any such provisions within his own system. The lawsuit acted on by Southern Center For Human Rights that initiated the onset of reliance of housing in Louisiana sets a big red flag on overcrowding — but clouds out so much arbitrary capricious conduct that hinders and obstructs access to court and attorneys yet if even two deputy commissioners rotated around, JTP could have had proper alternatives in a timely manner. If writing were dependable, without interception — then it would be so for SLCC (South Louisiana Correctional Center) for same precautions should have been available at JTP.

7. Instead a long term pattern of retaliation and unchecked arbitrary conduct continues without eye to eye/ear to ear contact (benefited by a select few). The United States District Court, Southern District Alabama, Southern Division, in Nicholson et al., v Chastaw County, et al., 498 F. Supp. 295 (1980) was evolved from "overcrowding at the jail in 1977 was a result of federal court orders concerning the conditions in the state prison system. As a result of these orders the state transferred some of its inmates to county jails..." (Id at 306) In the cause at hand the Commissioner merely does a walk through with his executive assistant escorted by a watchful administrative officer — already under duress of implied threats, one does not dare approach. No action has been taken to insure correction of inadequate communication access here.

[1] Civil Action No. CV-02-T-957-N

8. This action is unreasonable, as such arbitrary abuse of discretion goes unchecked with unreviewable power of prison administration has resulted in actual damage in this Plaintiff's access to court and attorneys.

"But it is precisely this unchecked power of prison administrators which is the problem that due process safeguards are required to cure. 'Not only the principle of judicial review, but the whole scheme of American government, reflects an institutionalized mistrust of any such unchecked and unbalanced power over essential liberties... Opposed is the view that the right may somehow undermine the proper administration of the prison, especially it accused inmates are allowed to put questions to their guards. That, however, is a view of prison administration which is outmoded and indeed antirehabilitative for it supports the pattern of hostility between inmate and personnel which generates an 'inmates' code' of noncooperation, thereby preventing the rapport necessary for a successful rehabilitative program. The goal is to reintegrate inmates into a society where men (and women) are supposed to be treated fairly by the government, not arbitrarily. The opposed procedure will be counterproductive.

...

The lesson to be learned is that courts cannot blithely defer to the supposed expertise of prison officials when it comes to the constitutional rights of inmates.

'Prisoners often have their privileges revoked, are denied the right of access to counsel, sit in solitary or maximum security... on the basis of a single unreviewable report of a guard (or Warden -- or those not even observing any implied incident -- in spite of statements by both parties involved to the contrary) When the courts defer to administrative discretion, it is the guard to whom they delegate the final word on reasonable prison practices. This is the central evil in prison. -- The unreviewable discretion granted to the poorly trained personnel who deal directly with prisoners' Hirschkop & Millemann, The Unconstitutionality of Prison Life, 55 Va. L. Rev 795, 811-812 (1969).

... The danger of retribution against the informer is not peculiar to the prison system; exists in every adversary proceeding, and the criminal defendant out on bail during his trial might present a greater threat to the witness hostile to his interests than the prison inmate who is subject to constant surveillance. See Preiser v. Rodriguez 411 U.S. 475, 492, 93 S.Ct. 1827, 1837, 36 L. Ed. 2d 439...

... we should no more place the inmate's constitutional rights in the hands of the prison administration's discretion than we should place the defendant's right in the hand of the prosecutor."

<u>Wolff v. McDonnell</u>, 418 U.S. 539, 596-597, 599, 600, 601; 94 S.Ct. 2963, 2994, 2996

---

2. Access to counsel is fundamental in access to court. In latter part of 1999, throughout 2000, and 2001, this prisoner benefitted such access by plentiful calls to court clerks at Trial Court level; of Alabama Court of Criminal Appeals clerk; to attorneys by use of a pre-paid phone card to Ozark, Alabama Court Clerk and Attorneys; and straight through to local calling of Alabama Court of Criminal Appeals; and two potential witnesses in Montgomery as local. At least one current officer/Guard was familiar with the procedures. -- Lt. Johnson (second shift/shift commander at present time) then was Sgt. Johnson and had questioned the use of the pre-paid phone card or was present when another guard questioned it. At that time Deputy Warden Gladys Deese confirmed the authorization. Now, such a fundamental access has been evaded ever since the October 7, 2005 return of this prisoner from SLCC to Basile, Louisiana, to JTP in Alabama for purpose of an October 17, 2005 hearing in Judge Coody's court -- most recent even a letter from a District Attorney was to no avail.

4

**9.** End of October, 2005, began requests for call to Federal Defender. For about two months Cpt. Wheeler evaded by excuses — unlike Cpt. Brown in 1999-2001, a written request then either achieved obvious results or eye-to-eye and ear-to-ear contact. Same with Warden Steve Dees both within 48-72 hours. Now in the last eight months written requests to both Warden Albright and Cpt Brown go unanswered and usually evaded when a face to face happens. Having noticed an open door policy with a select few such an attempt was made by this prisoner to Cpt Wheeler. Eventually, the request was referred to Warden Albright. Without any success of follow-up on written request — face to face with Warden Albright beginning of February 2006. On that Friday afternoon he approved, (the law library secretary to assist) the Federal Defender and his Supervisor had had left early for the day. The first two days of the next week the legal library supervisor (supervisor) evaded any follow-up. Then on February 15, 2006, a return call was made through the Chaplain about the death of this prisoner's daughter. A complaint was written to the Warden's secretary. The next face-to-face opportunity to the warden (a face-to-face is when he goes into the library for other reasons and is approached) He firmly and arbitrarily refused any further calls to attorneys or anybody. This was in retaliation to the complaint on his Chaplain[1] to which he made no prior effort to communicate about. The chosen issues went to the wayside — the first opportunity to see the federal defender was on the eve of due date of filing — after letters were to no avail, a Motion to Dismiss sent on January 17, 2006, got a visit on January 19, 2006.

10. Most Recently, post-marked May 26, 2006, was a letter from District Attorney Kirke Adams:

Re: Copy of letter to Warden

Dear Mrs Johnson:

I have sent you a copy of the letter I sent the Warden, I hope they will let you call. If you have any problems, please write me.

Sincerely,
Kirke Adams
District Attorney

Although he addressed the letter to Mrs. Gladys Deese, Warden — Julia Tutwiler Prison — as Mr. Frank Albright is now warden and has actively overtaken her duties it seems he neglects this one. (see attached Appendix A)

---

[1] Warden Albright referred to the complaint of the Feb. 15, 2006 incident in stating why there was a refusal on any call to attorneys

11. In <u>Nicholson</u>, 498 F Supp 295, supra, "Access To Lawyers and Legal Material,"

"To permit inmates to telephone their attorneys between the hours of 8:00am and 6:00pm. There shall be no period upon initial entry, to wit, 24 hours, into the jail in which an inmate is denied access to call his or her attorney."

Prior to Warden Albright's influence beginning as Deputy Warden—such was the case here— however at his whim not so. A pre paid phone card has been provided by an outside contact person to call District Attorney Adams— and it is highly unlikely that a man of such dedicated position would be a threat to security as implied by Warden Albright in last conversation.

12. In <u>Johnson-El v. Schoemehl</u>, supra, the factor of "Right to Counsel and Legal Materials" addressed similarly:

"Pre-trial detainees have a <u>substantial due process interest in effective communication with their counsel and in access to legal materials</u>. When the interest is inadequately respected during pre-trial confinement, the <u>ultimate fairness of their eventual trial can be compromised</u>. <u>Campbell v. McGruder</u>, 580 F 2d 521, 531-32 (D.C. Cir. 1978) (statistical disparity in convictions even when other factors are controlled.)

'Federal Courts are not prison managers. Ordinarily we accord great deference to the internal <u>administrative</u> decisions of prison officials. *** But where, as here, a prisoner alleges that a particular restriction imposed upon him by the prison officials impinges upon his exercise of <u>constitutionally guaranteed rights it is incumbent upon us to carefully scrutinize the effect of the restrictions</u>. *** It is clear that ready access to the courts is one of perhaps <del>the</del> <u>fundamental constitutional right</u>.'

<u>Cruz v. Hauck</u>, 475 F. 2d 475, 476 (5th Cir. 1973) See also, <u>Adams v. Carlson</u>, 488 F 2d 619, 630 (7th Cir. 1973) ('All other rights of an inmate are illusory without it ***.')

(emphasis on <del>the in</del> italic in text; other <del>emphasis</del> added here)

13. The United States Supreme Court in <u>Faretta v. California</u> 422 US 806, 95 SCt, 45 LEd2d 565 (1975) recognizes that it is the accused that suffers the consequences and not counsel; that the Sixth Amendment does not merely provide "that a defense shall be made for the accused; it grants <del>to the</del> the accused personally the right to make (her) defense" (Id. 422 US 819). Had the administration of JTP from October 2005, to date recognized this Sixth Amendment right, this accused could have communicated to Counsel. When she finally got a notice on January 3 2006, of Counsel's full name and address, she had already written the Federal Defenders Executive Director and without ability to call all attempts were thwarted. The United States Court of Appeals wrote "We suggest that you communicate with your attorney concerning issues or arguments which you believe should be presented to the court." (Appendix B)

6



14. Hence "issues or arguments" were thwarted by Cpt. Wheeler and Warden Frank Albright's disrespect to the Sixth Amendment right to personally make her defense for this accused, and has an imminent impact on communication with the District Attorney by the arbitrary retaliation of Warden Albright; which also intrudes on the due process interest in effective communication and access as noted in Johnson-El, supra; offending the Fourteenth Amendment.

15. On January 11, 2006, this prisoner requested twenty sheets of paper from the legal library supervisor. She refused, demanding that could be bought at canteen (prison store). No plain white paper is sold on canteen — so that is not a consideration. All the paper available had been used for a Motion to Dismiss the Federal Defender. There was a critical deadline on a pending issue. Had the paper been provided, the document could be completed and sent out for copying and forwarding. One day is critical, yet for lack of cooperation, (no resources) had to resort to having ten inmates get legal packs Thursday (Jan. 12, 2006) to have 20 sheets of plain paper. Because the document was not completed until 8:30 am Friday (Jan. 13, 2006) just missed mail pickup. The only alternative was prison copies at an outrageous price of 50¢ per page—seven copies of 38 pages equals $133 (one hundred and thirty three dollars) for a prisoner of such limited means. (No percentage per month — one lump sum debit.) This type coercion merited court's intervention—but fear of retaliation made a delay until achieved all one could hope to achieve. This was not the last time paper was refused.

7



16. On that Friday, this prisoner gave the former legal clerk a note for the supervisor quoting Bounds v. Smith 430 US 817, 97 S.Ct. 1491 52 L.Ed 2d. 72 (hn 6): "Indigent inmates must be provided at state expense, with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them." This is an affirmative obligation to assure all prisoners meaningful access to courts — undisputable (emphasis added)

17. In anticipation of the coerced last resort it was included, Gluth v. Kangas, 951 F. 2d 1504, (hn 18)(9th Cir 1991): "District Court did not abuse its discretion in requiring State Department of Corrections, for purpose of providing indigents adequate access to the Courts, to allow indigent inmates free photocopying of legal materials limited to number of copies of document required by the Court, plus one copy for opposing party and one for inmate's records." Moreover, "Litigation necessarily requires some means of accurate duplication because the court and the parties need to refer to the same documents. Photocopying is a reasonable means of providing the necessary copies." (Id Gluth at 510, text relating to hn 18)

18. That Monday, January 16, 2006, was a holiday, so Tuesday, (Jan 17, 2006) this inmate approached the former supervisor about copies. She referred this inmate to Cpt. Wheeler. In turn Cpt. Wheeler referred back to the Supervisor. It was Wednesday, January 18, 2006, before able to relocate the former Supervisor. Again she insisted for copies had to see Cpt Wheeler. At entry to Cpt. Wheeler's office before even speaking, Cpt. Wheeler picked up her phone (to the former supervisor) saying, "Martha Johnson is in here saying there's some law about free copies." Hanging up the phone, "said, no such thing." Then instructed to sign a voucher and copies were made — a day later than should have been to be in Atlanta by Friday January 20, 2006. Rather than risk retaliation until after appeal completed decided to hold off on making an issue of paper refused coercing copies at that time.

8



19. Then there came an issue of inadequate time scheduled for research in the legal library. The former supervisor insisted only two inmates to research at a time. Prior to April 15, 2003 departure it was four allowed at a time. After firmly insisting different, the supervisor checked and realized her error. Instead of acknowledging, she merely neglected to follow up on scheduling and this inmate had unlimited access for about two months. Inadequate legal clerks asking assistance was no problem due to an understanding. Until the most recent dominant one, (most inadequate of all). This interfered because of distractions — moreover due to her lack of training she was misguiding others which in turn interrupted this one's research — and was of no help in areas this one had no experience. Then came reliance on: "While adequate law libraries provided by a State are one constitutionally accepted method to assure meaningful access to the courts for prisoners, alternative means may also be used to achieve such access." It was emphasized as a suggestion to the supervisor that (Bounds v Smith, headnote 13) the use of law students (as in text relating to hn 13) in formal clinical programs volunteers for more efficient and skillful handling of prisoner cases could also avoid litigation on inadequacies — as Jones school of law in Montgomery and University of Alabama law students would have a mutual benefit — and Auburn University already had creative writing classes over the years. "Not going to happen" So this inmate continues to struggle.

20. As to inadequacy of time prior to February 2006 and since May 11, 2006, it was provided by the United States



Supreme Court in Lewis v. Casey 518 US. 343, 116 S.Ct. 2174, 135 LEd 2d 606 (1996) about a ten hour minimum per week (however that section is not in notes and no access prohibits locating. Yet, in Johnson-EL, supra;

"Inadequate library access and facilities may compound the problem. Even if detainees actually were given one hour twice a week in the library, --- this is obviously inadequate to research most legal claims. Williams v Leeke, 584 F 2d 1336 (4th Cir 1978), cert denied, 442 US 911, 99 S Ct 2825, 61 LEd 2d 276 (1979) (forty-five minutes three times a week usually so meager as to be unmeaningful); Nickl v Schmidt, 351 F Supp 385 (W.D. Wiss 1972) (two hours per week insufficient) Mc Donnell v. Wolff, 342 F Supp 616, 622 (D Neb 1972) (seven hours per week unreasonable), aff'd on this ground, rev'd in part, 483 F2d 1059 (8th Cir), reh'g denied, 483 F 2d 1067 (1973) (per curiam), aff'd in part, rev'd in part 418 U.S. 539, 94 S Ct 2693, 41 LEd 2d 935 (1974) (this issue not appealed).

Also there is in Gluth v Kangas, supra, The Department (Doc) objected to ten (10) hour minimum for law library time each week, the minimum two hour law library turnouts, and the inmates opportunity to select their turnouts. The Department waived any objections to and two hour turnouts In its 'Response to Special Masters Proposed Order,' it stated that "[t]he requirement of ten (10) hours minimum of actual law library use each week is basically reasonable,' and that it had 'no objection to a minimum of two hours actual library use 'at each 'library turnout." (Id Gluth text relating to hn 20 under Access Injunction)

21 On May 11th 2006 this plaintiff put a written request in for legal research time. A new legal library Supervisor, Ms Thomas responded with 8am-10am Friday May 12 and 8am-10am Monday May 15. On May 15 another request was placed quoting Gluth v Kangas for a minimum of two hour visits rather than a maximum and a written request for 30 sheets plain white paper the written response was May 17, 8:30-10:30am and May 18, 8:30 to 10:30 am, if space available and more time needed to locate her with a request form in hand. The library closes 10:30 am until 12 pm, so



was certainly restricting to two hours per visit. On Friday May 12, 2006, it was discussed with Ms Thomas that in January the issue of paper, carbon paper and research schedule had been settled with the previous supervisor and that she, in caution, had called Attorney Tobias Thomas (Counsel of record for DOC) in establishing all but free copies.

22   Apparently Warden Albright stood true on a previous threat "I'll lock you down". April 29, 2003, in SLCC Basile, LA. This prisoner had asked about no legal library and allergic to cigarette smoke locked in with forty smokers. Just deal with it was not the anticipated answer, so a form was requested for Civil Action persuant to 42USC§1983.

23 This brought back to April 29, 2002, when a written request to then Deputy Warden Albright and Warden Deese stated:

"Because of an incident today — I'm considering a §1983 lawsuit, which would inevitably involve you, Ms Holly Boyd² inmate Janice Heck and Warden Deese, possibly others. Out of respect to you, I prefer to talk to you first. Janice Heck has manipulated Ms Boyd and Ms Wamble with her whining deceit. So my attempt to discuss with Ms Boyd today at 2:15 was refused. This incident is compiled with numerous previous related problems. I've researched as good cause to solve, by whatever action required."

24 That got immediate response — two gaterunners (inmate messengers) escorted this prisoner to the warden's office. In intimidating retaliation, Warden Albright gave both Janice Heck and Martha Johnson a job change. (Plaintiff's job was cleaning a section of main hall at the time) Both adversaries were put to work together as

---

² at that time Ms Holly Boyd was legal library Supervisor, up until mid-April 2006 her replacement was Ms Dawn Tumlisen.

11



tutors (teaching) at Trade School. Defiantly to this Plaintiff he said "That'll keep you busy 7to3 every day and if I find out you're taking papers to or from Trade School Campus I'll write you up personally".

25 Because of hereditary skin cancer syndrom, a no prolonged sun would put this prisoner to the front of the waiting line and she put in for a year to finish an Associates' Degree to which the administrator arranged. In retaliation Warden Albright pulled this one from Trade School and put her in the kitchen 2:30am to 10:30 am five days per week. After much effort to comply, a profile limiting work performance ended that job participation.

26 At first opportunity to make a drastic change, the administration transferred to Louisiana, where the threat of lockdown was made. Such a lock-down did occur for eleven days solid with defiance to Court Order of July 8, 2003, and most surely March 2, 2005 (docs #2083 & 8 respectively, latter being reasonable access to documents) At the time appeared to be an error as "under investigation" proved wrong since Plaintiff had authored and donated four motions as forms (two examples as Appendix C, D) and was accused of charging for a Motion (as found out later). All legal papers were locked in property except for replacement Appendixes received on lock down day May 27, 2005. It had been strongly emphasized then as a critical time in the appeal, just as recently, when Cpt Hewlett arrived the following week as a "Monitor" — a two page complaint about false accusations, and no accuser, and no due process. Still another week, when day before Cpt Wheeler was due to arrive — all three lockdown cells (9 or 10 total inmates) were released for lack of due process

27. The Pattern continues -- as just as sure as persuasion in a discussion face to face with Ms Thomas (present legal library supervisor) ended with going to talk to Deputy Warden Hood (former supervisor was Deputy warden Hood's secretary) and a simple Gluth v Kanges minimum rather than maximum on the last request apparently rekindled Warden Albright's threat.

28. On May 18, at 7:30 am in a discussion it was mentioned that Alabama Court of Criminal Appeals upheld conviction based on three inmates claiming a jailhouse confession. One was present at the time. "I'm about tired of your mouth." Her tone and demeanor alarmed officer Tucker. She tried to recover by saying "It's over something that happened ten years ago. I told them when I arrived here [4] I was a witness at her trial." When escorted to the Warden's office, he asked her first and she replied "I don't have a problem with her." (the Plaintiff) Then he asked the Plaintiff, if (the Plaintiff) referred to the three witnesses at the trial. The reply was Yes but no assault or intimidation was made. Of Course, the witnessing officer was not present to be questioned by the accused - The only ones present were not even witnesses — whereby this was obvious as to outcome. The Warden then said he's enforcing a four month protective custody rotation with the Plaintiff first, (to be locked down four months)

_____

4. Her arrival here was about April, 2006 -- 7½ years after the trial

13

29. The Plantiff again emphasized there was no cause for protective custody. The Warden implied assault could happen in passing on hall. Then the Plaintiff emphasized that her appeal was again at a critical stage. Warden's reply was "you'll get all the books you'll need, lock her up in restriction dorm." If indeed the witness was a concern rather than an excuse — she could have been transferred to SLCC in Basile Louisiana, straight out of receiving as others have been [5] — but instead she was placed in Dorm 2 until a bed came available in Dorm 9, to be placed in same dorm with Plaintiff. About a week passed before any such action. Coinsedentally, the library request quoting Gluth V Kangas had May 20, 2006 as dead line.

30  With intention of mailing out by Thursday afternoon, at latest Friday May 19, 2006 before 8am pickup on mail, Plaintiff was up all night (Wed. May 17 until 5am finishing all but two cites on Table of Authorities and Verbatim for Constitutional and Statutory Provisions Involved page of Supporting Brief for Petition for Writ of Certiorari. This would have been completed on May 18 scheduled research time and ample time to mail out to be copied by outside contact person Saturday May 20, 2006, and forwarded in ample time for the dead line.

_____

[5]  A trip with transferred inmates was made on May 18, 2006 and again on June 8, 2006, to which the witness was not included

14



3 l. As another consideration, on Friday, May 19, 2006, paper and carbon paper was requested to be able to do carbon duplicates— refused. The last resource was to invoke the <u>Gluth v Kangas</u> rule of indigent copies based on a <u>current</u> Prisoner's Money on Deposit printout showing 0 (zero) balance since January 18, 2006. Planning for an unsworn declaration to be May 24, 2006, this was looking hopeful for afternoon of May 24.

32. At approximately 1:30 pm May 24, the Plaintiff was ordered to hurry up and pack— straight to Segregation. All afternoon processing killed the last hope of salvaging timeliness on filing the last <u>hope</u>. It became obvious the sweet revenge of retaliation at <u>full</u> squeeze.

33. On Friday May 26, 2006, Cpt Wheeler came to Segregation (seg) as part of Seg Board. This plaintiff read headnote 18 to her about indigent copies.— referring to the January 18, 2006 discussion. Cpt. Wheeler advised to put in a written request. Waiting for her, in her box for May 30, 2006 return from Memorial Day, was entrusted to be asking for notary on an endorsed motion for Remedy due to a State created impediment and two copies of documents — one for opposing party's counsel of record and one for Petitioner's records. No follow-up was done.

15



34. On June 2, 2006, Cpt Wheeler came back through Seg as "Seg Board". Again, Plaintiff pleaded and stressed urgent, and that written request had been placed. Cpt. Wheeler's ~~excuse~~ excuse was that her secretary is gone now (she did not follow up when her secretary was here) She assured that she would get a notary and get it done. (Cpt Motley Hewlett and Lt. Lenita Hawthorne are both notaries -- so the excuse of the missing secretary was notarizing is not a _true_ contributing factor to ignore access to court or assisting in a remedy for default by state created impediment). As the pattern of deliberate indifference continues—still no follow up. On Friday, June 9, 2006, Cpt Wheeler was said to be in Louisiana (her turn as "Monitor" at the prison there). So a substitute came for Seg Board. It is obvious Cpt Wheeler has no intention for follow-up. "Meaningful Access" is obstructed here. In _Bounds_ supra, Mr Justice Stewart, with whom whom Mr Chief Justice Burger joins, dissenting (_Bounds_, 430 US 834):

"In view of the importance of the writ of habeas corpus in our constitutional scheme"; "it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed." _Wolff v McDonnell_, 418 US 539, 578, 41 L Ed 2d 935, 94 S Ct 2963, 71 Ohio Ops 2d 336 quoting _Johnson v. Avery_, 393 US 483, 485, 21 L Ed. 2d 718, 89 S Ct 747."

35. Diligent requests have been written to Warden Albright—and ignored. At a later date it is prayed that this Court will grant leave to be amended as Appendixes. It is forbidden for outgoing mail to be sealed in Segregation—all outgoing mail is read by CO in Seg prior to sealing. In population of this prison up to three page letters have been sent out sealed. Over three pages requires a glance by a CO to detect any contraband—then sent out after inmate seals in presence of CO - and envelope is initialed. It is unreasonable, that mail in seg is not respected. This creates a _higher_ risk of instructions to outside contact person or documents to be omitted or lost."(Not equal protection)

36. The inadequate legal clerk informed Warden Albright of her inadequacies at the beginning of her job assignment. In his persuasive manner of coercion and intimidating, he advised her she'd better be finding out and suggested

16



that she seek guidance from Kay Talley (a former legal clerk that was best suited.— but now is questionably assigned to Health care) For fear of kitchen or laundry assignments, the inadequate legal clerk remained; much to the dismay and furthering anguish of this dilemma.

37. Even though this one not knowledgable in the law has been shown how to locate reporters, Alabama Code and United States Code, she continues to blunder more than help- She left 951 F 2d (Gluth v Kangas) 52 L. Ed 2d (Bounds v Smith) Wednesday May 24, 2006 insisting only two books and only for four hours. Those were not picked up until about June 6, 2006, in seg escorted by Sgt Mills with a message from Warden Albright to buy paper on Canteen.— only four pages provided for the repeated request of thirty sheets of paper. A written request had been made for USCA Amendment 14 and 28 USC §2263 — Instead she delivered Amendment 14 and Amendment 15 to end and index, Sgt Mills steered her away before wrong book could be discussed, but not before being reminded clear white paper is not available on canteen. (The Warden is most likely aware that this inmates Prisoners Money on Deposit (PMoD) has had a 0 (zero) balance since January 18, 2006 whereby it is ludicrous for him to taunt in such a manner) (That part was not mentioned to Sgt Mills) With mention of supplying paper was understood in January, she said, "do it again."

38. Apparently, Counsel for DOC, Attorney Kim Tobias Thomas is either not fully informed; or he's not relaying information properly to JTP, or the authorities at JTP are misrepresenting Attorney Thomas' advice. It's high time (actually after the fact, late) for some sort of guidance to prevent further confusion, it is prayed to help an understanding.

39. Another inherent situation of hindrances on access to court that continues a pattern is at hand. In June, 2000, CO J. Mason, at the urging of another inmate, approached the plaintiff about excess paper



Emptying this prisoner's drawer into a laundry buggy, then escorting to Administrative Lt Walker's Office, anticipating backup. Lt Walker, at first glance said, "Martha, you're going to court month aren't you?" ("Yes mam") "She can take it to court, just put it in property." Instead CO J. Mason escorted Plaintiff to another area demanding some excess paper to be cleared out.

40. On May 18, 2006 after over four hours plundering through legal papers and belongings by another officer processing was over. At just after 10:00 pm CO J Mason approached demanding excess paper had to go — cramming legal papers, books and all into garbage bags. A Malto Meal (Corn Pops) cereal bag protected a Bible, and nine other (Corn Pops) malto meals bags protected and organized legal documents since Mid-December. Unfortunately the Petition for Writ of Certiorari/Brief was out loose, waiting to be processed — got crumpled. Shortly Lt Nelson (Shift Commander) sent for Plaintiff to shift office offering boxes to resort and organize legal papers. Upon Plaintiff's return to the restriction dorm — CO J. Mason questioned Lt. Nelson and was disgruntled with her response. (A scrabble dictionary used for correct spelling got ripped in the escapade.)

41. At next opportunity, CO J. Mason, working Seg, third shift Seg on Friday May 26, 2006 demanded all "excess paper" to be crammed into a garbage bag and if the papers got removed from the bag it would be a disciplinary. (The plaintiff had just managed to organize and arrange her legal papers again — a third time since May 18 and was destroyed again.) This time CO J Mason took all the covers that had been protecting and organizing legal papers and other for over five months so fraying of edges and crumpling and tearing was more than ever. Two days later a regular Seg officer brought an extra drawer for containing the "excess paper."



42. Confiscation and damage to legal documents and other property in retaliation is a violation of the First and Fourteenth Amendments. According to Thomas v. Evans, 880 F.2d 1235 (11th Cir. 1989), "First Amendment prohibits state officials from retaliating against prisoners for exercising right of free speech. First Amendment also prohibits state officials from denying prisoner's legal right of access to the Courts U.S.C.A. Const. Amend I" (Id Thomas, hn 11) (see also Wright v. Newsome, 795 F.2d at 968, as cited in text relating to hn 11, Thomas at 1241-1242) As to access to Court in First Amendment The Eleventh Circuit cites Johnson v. Avery 393 U.S. 483, 89 S. Ct 747, 21 L.Ed. 2d 718 (1969) and Hall v Sutton, 755 F.2d 786 (11th Cir 1985)

43. This prisoner states a claim of retaliation on exercise of freedom of speech having suffered long term pattern; beginning with most impact at onset April 29, 2002, and full blown the last seven to eight months.

"To state a first amendment claim for retaliation, a prisoner need not allege violation of a seperate and distinct constitutional right. By way of analogy, in Bridges v. Russel, 757 F.2d 1155 (11th Cir. 1985), we held that a prisoner stated a claim of retaliation based on the prisoner being transferred to another facility even though prisoners do not have a liberty interest in remaining at a particular facility. The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech. The penalty need not rise to the level of a seperate constitutional violation. See, e.g., Wright v Newsome, supra, 795 F.2d (prisoner stated a retaliation claim and a claim of denial of access to courts based on the confiscation of legal materials); Hall v. Sutton, supra, 755 F.2d at 787 (prisoner stated a retaliation claim based on confiscation of various personal possessions."

44. In the cause at hand, in addition to CO.S Mason's escapades; on or about May 23, 2006, Plaintiff's sister called Warden Albright for reassurance of authorization of an incentive box. With approval the box was shipped next day — all these weeks later that box has been withheld by Lt Hawthorne, in violation of First Amendment. Lt Hawthorne also

19



taunted the Plaintiff in a sinister tone about putting Plaintiff on next trip to Louisiana. This occurred May 18, 2006, inferring could be put on list.

45 If indeed Warden Albright's true purpose in having this inmate locked down—confined from reasonable access to court and blocked on two seperate critical days to obstruct her last hope of all she could hope to achieve—he would have had Annie Bell Morse (the Witness) transported to Louisiana. (a trip left May 18 and June 8, 2006 and she was not on either one—some earlier on). Instead, as setting the stage, the authorities placed the witness in the dorm with the intended target (the Plaintiff) and because again exercise of freedom of speech—by a mere comment such extremes to compound the First Amendment violation with Fourteenth, Sixth, and Eighth Amendment violations as above and foregoing factual basis provides showing of impact.

46 Now we have a state created impediment at the worst possible time with no system of checks or monitoring to avoid such arbitrary conduct. The degree exacerbated to Eighth Amendment. According to Nicholson 498 F Supp 295, 308:

"The Eighth Amendment prohibition against cruel and unusual punishment ' is not limited to specific acts directed at selected individuals, but is equally pertinent to general conditions of confinement that may prevail at a prison " Gates v. Collier, 501 F 2d. 1291, 1301 (5th Cir-1974)

## CONCLUSION

Your petitioner asserts that she endured long term retaliation to avoid the very outcome she now suffered in actual damages. The legal research request quoting Gluth v Kansas stated May 20, 2006 as deadline. Of course that was to have in hands of outside contact person for copying and forwarding ample time for 90 days

20



from February 24, 2006. The very obstruction on the day intended to finish final research was <u>unjustified</u> and the repeated extreme escalating by the <u>worst</u> confinement imaginable (Appendix E) in segregation lock-down on the <u>very</u> last opportunity to salvage an unsworn declaration was destroyed. To add insult, devastation and more anguish, the Administrative Captain teases with <u>feigning</u> to intend to help with an endorsed notarized Motion to Remedy Default by State Created <u>Impedement</u> was just more retaliation; carried over from her months of feigning concern for a phone call to the Federal Defender — Eigth Amendment tortured.

The damage is <u>beyond</u> description. Anguish of thwarted work having an extremely small ray of hope —— but <u>still</u> due process provides for that last chance of hope as does Equal protection of the law. In violation of Fourteenth Amendment demolished by retaliation.

Sixth Amendment right of communication to Counsel <u>blatantly</u> mocked face to face by Warden Albright while Cpt Wheeler's less obvious subtle sniping method contributed to violation of Sixth Amendment, First Amendment and Fourteenth Amendment — as even now Plaintiff's sister provided a pre-paid phone card to call the District Attorney yet the authorities evade that access to Court.

The damage and anguish is escalated by Commissioner Allen not providing a system of monitoring his <u>own</u> designee's arbitrary conduct yet an astounding amount for Louisiane.

21



Your Plaintiff pleads urgency for injunctive and declarator relief-
er inadequacies submitted in accompanying Motion for injunctive
and declaratory relief. Also to be granted leave for an amended
pleading for compensatory and punitive damages once released
from lock down to have sufficient access to rules and statute.
Substantial hardship and actual damage deserves more urgent
relief to remedy access to court as soon as practicable.
Employees of the State of Alabama involved in this escapade
mistakenly believe wanton conduct is covered by immunity,
unless this court sees fit to intervene there is no limit to the
furthering of anguish and prolonging constitutional violations.

Respectfully Submitted,

*Martha Jane Johnson*

## CERTIFICATE OF SERVICE

A set of the Petition Forms, Supporting Brief and Two Motions are included as
I hereby certify that I have entrusted the above and foregoing to an outside
contact person via United States mail to have the original and two copies
mailed to Hon. Debra P Hockett clerk of the court, District court of United States,
middle District of Alabama, PO Box 711, Montgomery, AL 36101-0711, with return receipts of
certified mail to be sent to the same of the Defendants — as a true copy to be
mailed by certified mail First Class postage prepaid and properly addressed to:

Warden Frank Albright
Julia Tutwiler Prison
8966 US Hwy 231
Wetumpka, AL 36092-5343

Cpt Cynthia Wheeler
Julia Tutwiler Prison
8966 US Hwy 231
Wetumpka, AL 36092-5343

C.O. Jane Moson
Julia Tutwiler Prison
8966 US Hwy 231
Wetumpka, AL 36092-5343

Commissioner Richard Allen
Alabama Department of Corrections
301 South Ripley Street
Montgomery, AL 36130

Honorable Kim Tobias Thomas
Counsel of Record For
Alabama Department of Corrections
301 South Ripley Street
Montgomery, AL 36130

on this the 19 day of June, 2006.

*Martha Jane Johnson*
Martha Jane Johnson 202230
Julia Tutwiler Prison seg 8
8966 US Hwy 231
Wetumpka, AL 36092-5343

22